Thomas BROWN, Plaintiff,

v.

Christopher SHERIDAN, as personal representative of the estate of Dr. Donald Sheridan; Physician's Assistant Jay Belkin; Forensic Unit Chief Wayne Crosier; Dr. William Kanar; Correction Officer Randall Lodge, in their individual capacities, Defendants.

No. 88–CV–1330.

United States District Court, N.D. New York.

July 22, 1995.

Robert F. Bensing, Prisoner's Legal Services, Plattsburgh, NY, for plaintiff.

David B. Roberts, Asst. Atty. Gen., G. Oliver Koppel, Albany, NY, for defendants.

## MEMORANDUM DECISION AND ORDER

McAVOY, Chief Judge.

## I. Background:

This action seeking damages under 42 U.S.C. § 1983 and under state law negligence principles for personal injuries allegedly suffered by plaintiff through defendants' violation of his rights under the Eighth and Fourteenth Amendments came before the Court for a bench trial on April 17, 1995. Plaintiff is an inmate of the New York State Department of Correctional Services ("DOCS") and from December 22, 1987, through January 5, 1988, the period relevant to plaintiff's complaint, plaintiff was confined at Clinton Correctional Facility, Dannemora, New York. Plaintiff's cause of action stems from the defendants' alleged failure to treat injuries he received during a use of force incident at the prison. In plaintiff's opening statement he conceded that his claim was being prosecuted at trial against only Wayne Crosier, director of the Mental Health Satellite Unit ("MHSU") at which plaintiff was treated/mistreated, and Correction Officer Randall Lodge, who was assigned to that unit during the relevant period.

Plaintiff Thomas Brown has a long history of psychiatric treatment and has been diagnosed as a bi-polar personality with psychotic features. Defendant Crosier, chief of the MSHU at Clinton testified that plaintiff's observable symptoms included paranoia, grandiosity and pressure of speech.[1] The Court observed all three features during plaintiff's testimony.[2] Notwithstanding the foregoing, the Court was able to understand plaintiff's testimony. Neither did the Court reject plaintiff's testimony based on any of the foregoing, but rather, the Court weighed plaintiff's testimony and credibility against the competing evidence in drawing its conclusions.

The Court now makes the following findings of fact and conclusions of law based on the evidence at trial.

## II. Findings of Fact:

On December 22, 1987, plaintiff was involved in a use-of-force incident with a number of correction officers at Clinton Correctional Facility.[3] After plaintiff was subdued he was escorted to the facility hospital and

---

1. Crosier has worked with the New York State Department of Mental Health for twelve years and holds a Masters in clinical applied psychology.

2. Particularly apparent was plaintiff's tendency to use neologisms and to consistently add the suffixes "istic" and "ism" to the end of most of his words.

3. By stipulation filed February 22, 1994, the parties agreed to the discontinuance of plaintiff's Eighth Amendment excessive force claim.

examined by Physician's Assistant Jay Belkin. Plaintiff was extremely agitated at that time and Belkin failed to diagnose any injuries to plaintiff's leg other than a contusion behind the right knee. (Belkin Dep. at 59). Plaintiff did not complain about his right leg to Belkin. (Belkin Dep. at 58).

After this examination Dr. Kanar, a Clinton psychiatrist, attempted to interview plaintiff. Based on the testimony of all concerned, including plaintiff, the Court finds that plaintiff was belligerent towards, resentful of, and rebuffed any and all attempts to treat him by the MHSU psychiatric staff.[4]

Plaintiff refused to cooperate with Dr. Kanar and was placed in a mental observation cell in OBS I, a temporary isolation unit for inmates with serious mental health problems. On plaintiff's mental health progress chart Kanar noted that "further observation [of plaintiff was] needed." (Ex. D 11). Since plaintiff was deemed a danger to himself he was placed in the isolation cell naked and with no possessions. The cell contained only a metal bed, a toilet and a sink.

There are no entries in plaintiff's progress notes from his 12/22/87 admission, (see N. 4 infra), until Dr. Kanar's 12/29/87 entry in which Kanar notes that plaintiff "complains of pain in his right leg and ankle." (Ex. D 11). Upon complaining to Dr. Kanar on 12/29/87, DOCS medical staff was consulted, at which time X-rays were taken and plaintiff was referred to Champlain Valley Physician's Hospital for further care. Plaintiff was ultimately diagnosed with a fractured fibula in his right leg. On January 5, 1988 plaintiff was transferred out of OBS I to the Central New York Psychiatric Center where he was fitted with a cast for his leg.

Plaintiff's own medical expert indicated in his deposition that the delay in medical care herein addressed caused very little difference in plaintiff's recovery from the injury. In his closing arguments plaintiff's counsel acknowledged as much, but pointed out that plaintiff endured unnecessary and avoidable pain and suffering as a result of the delay, and that plaintiff was entitled to be compensated for such if it was attributable to the wrongful acts or omissions of the defendants.

Defendant Crosier testified at trial that standard procedure in OBS I requires that the assigned corrections officer (such as defendant C.O. Lodge) visually check each inmate every fifteen minutes and that nurses make twice-daily rounds. Crosier testified that MHSU psychiatrists do not necessarily visit every patient every day, but rather MHSU psychiatrists monitor by client needs. Crosier also testified during his deposition that psychologists and social workers also make daily rounds of the various housing units. (Crosier Dep. at 51–55). Finally, Crosier testified that each round made would not necessarily result in a record being made of that visit, but rather, only salient changes of behavior would be recorded. Crosier did state, however, that each visit to OBS I should be noted in the log-book maintained thereat. Finally, Crosier testified that DOCS (as opposed to MHSU personnel) is responsible for security and medical problems which come to their attention. In his testimony Crosier also pointed out an entry in the OBS I logbook on 12/22/87 (Ex. D15, p. 278) reflecting that at 12:30 p.m. OBS I inmate Lafata requested a sick call and that the satellite unit nurse had been notified. The log further reflects that at 12:55 a satellite nurse visited inmate Lafata.

Plaintiff testified that he was in pain from his right leg the whole time he was in OBS I. He also testified that he couldn't walk during that period and that both legs were swollen the whole time. He further testified that

4. Plaintiff's Patient Progress Notes for 12/22/87 (Ex. D 11) read in pertinent part as follows:
Pt. well known to M.H.S.U. staff, brought to E.R. in highly agitated state reportedly making threatening statements toward all staff.... (Cobus Entry)
In OB1 is very angry and says that he was beaten, that he refuses to take meds that he only wants to talk to a lawyer and that he doesn't want to talk to me. He answers one more question (doesn't want to go to Marcy) before telling me to "get the f**k out of here." (Kanar Entry)
The Court notes also that on plaintiff's X-ray Requisition and Report dated 12/29/87 there is a notation that "pt was verbally abusive during exam," which is some evidence that plaintiff's lack of cooperation continued throughout the relevant period.

defendant Lodge was stationed at a front desk in OBS I and that he saw Lodge daily during the relevant period. Plaintiff also testified that he complained about his ankle to Lodge (and every other C.O. he came in contact with) and asked for pain-killers. Plaintiff expressly testified that he saw defendant Crosier through the slot in his cell door during the relevant period and showed Crosier his leg and complained of the injury. He claims that Crosier responded that "he would speak to someone; this is not my unit."

In his deposition, however, plaintiff testified that he complained to the C.O.s "several times," (Brown Dep. at 67), although he couldn't name a particular Corrections Officer he spoke with. Plaintiff expressly testified at that deposition that he didn't speak to the psychiatric staff while he was in OBS I and that he never complained about his leg to the psychiatric staff. At trial he explained the discrepancy between his prior testimony of no communication with psychiatric staff and his later testimony at trial that he complained to MHSU head Crosier, by his having refreshed his recollection by reviewing the MHSU Logs.

Defendant Crosier testified that he did not work from 12/25 to 12/28 inclusive, and that he made rounds on OBS I on 12/22, 12/24 and 12/29 (after Kanar had reported plaintiff's complaint; Crosier testified that he examined plaintiff's leg on the 29th and observed a "mild distention of the right leg"). Crosier further testified that he spoke with plaintiff on the 22nd and the 24th, and that on both occasions plaintiff was abusive and uncooperative and told him in no uncertain terms that he wanted nothing to do with the psychiatric staff. He further testified that in his observations on the 22nd and the 24th plaintiff moved "very well": plaintiff "bounded" off the bed to curse Crosier whenever Crosier appeared and plaintiff had no difficulty moving his feet and legs. Crosier also observed plaintiff moving around shadow-boxing in his cell as he threatened Crosier. In his profes-

sional capacity Crosier pointed out that patients suffering from bi-polar disorder, such as plaintiff, could very well be de-sensitized to pain and have an impaired ability to accurately recall events without distorting and exaggerating them. Crosier further testified that plaintiff was nude throughout Crosier's observations of him and that Crosier made no negative observations of plaintiff's leg.

Defendant Lodge testified at his deposition that he worked in OBS I during the relevant period, but that he had little independent recollection of events during that time. (Lodge Dep. at 9–11). Lodge testified, supported by entries in the OBS I logbook, (Ex. D15), that he performs rounds at least every fifteen minutes when assigned to OBS I and that his records reflected no communications between himself and plaintiff; nor did he have any independent recollection of communications with plaintiff. (Lodge Dep. 11–15). Lodge also testified that he had no recollection of it coming to his attention that plaintiff was complaining about an injury to his right leg. (Lodge Dep. at 29). Lodge's logbook did reflect that plaintiff was yelling obscenities from 6:45 until 8:00 p.m. on December 26, 1987 (Lodge Dep. at 20), and that plaintiff was talking loudly and yelling at 3:30 p.m. on January 4, 1987.[5] Lodge's logbook also reflected that various nurses made rounds during the relevant period. (Lodge Dep. at 29). Finally, Lodge testified that he had no recollection of plaintiff ever asking to see medical staff during this period and that "if he had, I would have notified medical." (Lodge Dep. at 38). Lodge expressed the view that "if an inmate has a physical problem that he is complaining about, we are not qualified to make a judgment. We pass it on to medical and let them decide." (Lodge Dep. at 40).

**a. Defendant Crosier's Knowledge:**

The Court first finds that Crosier's testimony reflects the more credible and accurate version of his communications with plaintiff. The Court has no doubt that plaintiff refused

---

**5.** Entries by various other C.O.'s during the relevant period reflect plaintiff yelling and shouting obscenities at various times, i.e. Sat. 12/26/87, 6:45 p.m.: "Rounds—Brown screaming about wanting to kill all 'white mother-f**kers' "; 7:00 p.m.: "Rounds. Brown still screaming."; 7:15 p.m.: "Rounds. Brown still yelling"; 7:30 p.m.: "Rounds. Brown still yelling"; calling myself "a 'f***t mother-f**ker' as I make rounds." (Ex. D15, p. 293).

to communicate with MHSU psychiatric personnel on *any* topic and that plaintiff forcefully rebuffed Crosier's attempts to interview him on 12/22 and 12/24. Furthermore, not only was plaintiff's testimony that he alerted Crosier to his condition inconsistent with his earlier deposition, but the answer that he attributes to Crosier (that "this is not my unit") is illogical and unworthy of belief. In short, the Court finds that plaintiff never alerted defendant Crosier that he required medical care for his leg.

### b. Defendant Lodge's Knowledge:

The Court next finds that plaintiff has presented insufficient evidence from which it can find that plaintiff told defendant Lodge that he was in pain or that he requested medical care from defendant Lodge. After examining the OBS I log maintained by the C.O.'s in that area, the Court is persuaded that Lodge meticulously noted all unusual events which occurred on his watch. The Court notes also the log entry of 12/22 reflecting another inmate's request for medical care and the immediate notification by the C.O. and quick response of an OBS I nurse. Lodge's testimony also reflected his familiarity with OBS I policy that C.O.'s should not attempt to "triage" inmate medical complaints but should simply notify medical staff of the complaint. Given that policy and the easy access to qualified nurses to interview complaining inmates in OBS I, it seems far more likely to the Court that any communicated request for medical care by plaintiff would have been logged and transmitted to the OBS I medical staff.

Plaintiff's testimony in contravention of Lodge's in this regard seems to the Court exaggerated and distorted, particularly where plaintiff indicates that he ceaselessly told all DOCS personnel within earshot and that *both* his legs were swollen and injured. In fact the OBS I log reflects that plaintiff's uncooperative and abusive behavior extended to the C.O.'s and continued throughout the relevant time frame.

Plaintiff's counsel points out that Lodge worked 5 shifts during the relevant period, which amounts to his presence in OBS I during 25% of the relevant time frame. The Court cannot, however, draw from the facts that plaintiff was injured, and that Lodge was present for one-quarter of the relevant time frame, the suggested inference that plaintiff *must* have complained to Lodge at some point. While it may be true that at some point in the relevant time frame plaintiff attempted to communicate a need for medical care to a C.O., the evidence supporting plaintiff's contention that he specifically told Lodge is insufficient for the Court to find it more likely than not that Lodge was notified.

### c. Should Lodge or Crosier Have Known of Plaintiff's Injuries:

The Court likewise cannot find by a preponderance of the evidence that the nature of plaintiff's injury was such that either defendant had to have, or should have upon the exercise of reasonable care, known of plaintiff's injuries. Plaintiff's own medical expert, Peter Kelly M.D., testified by way of videotaped deposition and indicated that plaintiff's fracture was not a joint fracture or a compound fracture, but rather a minimally displaced fracture to a non-weight bearing bone. Kelly indicated that while plaintiff's injury could very well have been apparent upon observation, he also indicated that plaintiff's leg only "*might*" have been uncomfortable to walk on."

Kelly indicated that the delay in treatment needed to be explained but also indicated that he would need to know whether plaintiff was observed limping and whether or not he complained of pain. Kelly also testified that plaintiff's swelling could have increased over the week that he was in OBS I and that since plaintiff had a "smaller" fracture he may have experienced a smaller area of confined swelling.

The Court has already adopted Crosier's testimony that plaintiff was moving freely about his cell on the 24th, and that Crosier observed plaintiff "bounding" off his bed and shadow boxing. The Court notes that the emergency room report from Champlain Valley Hospital reflected that plaintiff was reporting only "mild leg pain" and that only "moderate swelling" was observed on plaintiff's "non-deformed" leg. The Court notes

in this regard also that the records of plaintiff's admission to Central New York Psychiatric Center on 1/5/88 reflect "some swelling of . . . both ankles, especially the right one," and that "the patient was walking without too much difficulty." (Ex. D13, p. 4).

Taken together, the record does not by a preponderance of the evidence compel the factual conclusion that either defendant necessarily should have, or must have, been aware of plaintiff's injury.

## III. Conclusions of Law:

Plaintiff is not understood to complain about the care he received after his 12/29 complaint to Dr. Kanar; rather, plaintiff complains that the evidence shows that the failure to treat him during the period from 12/22/87 until Kanar's visit on 12/29/87 constitutes denial of his rights under the Eighth Amendment by defendants Lodge and Crosier. Failing that, plaintiff claims that the failure of these defendants to comprehend his condition during that period constitutes at least negligence under New York State law.

### a. 42 U.S.C. § 1983:

To prevail on his claim under Title 42, section 1983, plaintiff must show that officials were 1) acting under color of state law, 2) that their actions deprived plaintiff of a right guaranteed by the constitution or the laws of the United States, see, Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), and 3) that the defendants' acts were the proximate cause of the injuries and consequent damages sustained by the plaintiff. Martinez v. California, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). Under § 1983, the standard for determining if there has been an unconstitutional denial of medical care is whether there has been a deliberate indifference to prisoner's serious medical need, illness or injury. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); see also, Bryant v. Maffucci, 923 F.2d 979 (2d Cir.), cert. denied, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991); Hathaway v. Coughlin, 841 F.2d 48 (2d Cir.1988).

Deliberate indifference to the serious medical needs of prisoners was defined by the Supreme Court as that which "constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle, 429 U.S. at 104, 97 S.Ct. at 291 (1976), citing Gregg v. Georgia, 428 U.S. 153, 182, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976). While one isolated failure to provide medical treatment to a prisoner, without more, is ordinarily not actionable, such action may rise to the level of constitutional violation if surrounding circumstances suggest a degree of deliberateness, rather than inadvertence, in the failure to render meaningful treatment. Gill v. Mooney, 824 F.2d 192, 196 (2d Cir.1987), Brown v. Coughlin, 758 F.Supp. 876 (S.D.N.Y.1991).

On this record plaintiff has failed to demonstrate deliberate indifference on the part of either of these defendants. The Court has found that after the use of force incident plaintiff was examined by physician's assistant Belkin and did not bring his injury to Belkin's attention. Plaintiff thereafter remained highly agitated and refused all care from the MHSU psychiatric staff, including defendant Crosier who visited plaintiff twice during his confinement in OBS I. On both visits Crosier attempted to interview plaintiff to ascertain his condition and needs and in both instances Crosier was violently rebuffed. In the absence of overt symptoms of his injury plaintiff had no Constitutional right to expect further from Crosier. Jones v. Smith, 784 F.2d 149, 151–52 (2d Cir.1986); cf. P.C. v. McLaughlin, 913 F.2d 1033, 1044–45 (2d Cir.1990) (no clearly established right to counselling services having rejected them when offered).

Likewise, the evidence establishes only that defendant Lodge discharged his duties and suffered abuse from plaintiff in return. See Gill, 824 F.2d at 196 (dismissal appropriate if plaintiff's behavior made it difficult or impossible for him to be treated effectively). In the absence of evidence that Lodge knew or had reason to know of plaintiff's injury, Lodge is not fairly chargeable with deliberate indifference to plaintiff's medical needs. Cf. H.C. v. Jarrard, 786 F.2d 1080, 1083 (11th Cir.1986) (prevailing plaintiff's demands for

medical attention ignored for three days); *Lewis v. Cooper*, 771 F.2d 334, 337 (7th Cir. 1985) (jury found that prevailing plaintiff "requested medical assistance immediately" and obviously required medical care).

■ Nor does the record support the imposition of supervisory liability on Crosier for his failure to institute a policy of follow-up medical exams for inmates admitted to OBS I. *See Williams v. Smith*, 781 F.2d 319 (2d Cir.1986). As found above, inmates admitted to OBS I are given a preliminary medical examination. C.O.s assigned to OBS I are required to make rounds every fifteen minutes and, as Lodge demonstrated at his deposition, are instructed of DOCS' and MHSU's policy that each medical complaint should be reported to MHSU medical staff for assessment. The record further reflects that this policy was followed as to at least one other inmate during the relevant period. These policies are reasonably designed to provide sufficient protection of inmates' rights under the Eighth Amendment. That plaintiff was particularly uncooperative and suffered an injury which was not immediately apparent does not render these policies constitutionally infirm. Indeed the record reflects that upon the first documented report of his injury to MHSU staff plaintiff received prompt and adequate medical care.

In short then, the Court finds that neither Crosier nor Lodge are liable under § 1983 or the Eighth Amendment.

**b. Negligence:**

■ Plaintiff's common-law negligence theory fails for similar reasons. Negligence, of course, requires the Court to find that these defendants had a duty of care to plaintiff; that these defendants breached that duty; and that plaintiff was damaged as a result of that breach. *See Pulka v. Edelman*, 40 N.Y.2d 781, 390 N.Y.S.2d 393, 358 N.E.2d 1019 (1976); 79 *NY Jurisprudence 2d*, Negligence § 8. In this case the defendants' had a duty of reasonable care to plaintiff. In the absence of a showing by a preponderance of the evidence that either defendant had notice of plaintiff's injury or would have discovered plaintiff's injury but for the failure to exercise due care, however, the Court finds no breach of the duty of reasonable care by these defendants. *See Pulka*, 40 N.Y.2d at 782 (in the absence of duty there is no breach and without a breach there is no liability).

Once again, the evidence establishes neither that these defendants were told by plaintiff of his injury nor that the nature of that injury was such that these defendants should have discovered it in the exercise of due care. Rather, the record shows that these defendants took reasonable steps to ascertain and monitor plaintiff's condition, and that when plaintiff disclosed his injury to them he received prompt medical attention. Plaintiff has not, therefore, established that either Lodge or Crosier were negligent in their dealings with him.

■ The Court notes also that plaintiff, at least in his pretrial memorandum, attempts to assert a claim for inadequate psychiatric care based primarily on the failure of MHSU psychiatrists to monitor him during the period from 12/23 to 12/28. The record does not reflect any *per se* violation in this regard. Certainly Lodge had no duty regarding plaintiff's psychiatric care. Furthermore, Crosier visited plaintiff on 12/24 and was violently rebuffed. Finally, plaintiff was not "totally abandoned" during the period following Crosier's visit until Kanar and Crosier's return visits on 12/29, (a holiday period during which Crosier was off.) The fact is that plaintiff was monitored around the clock and provided prescribed medications and had access to round the clock nurses. In any event plaintiff introduced no evidence that the care he received fell below the standard of care in the relevant community *Schrempf v. State*, 66 N.Y.2d 289, 295, 496 N.Y.S.2d 973, 487 N.E.2d 883 (1985), or that he was damaged in some way by the failure of psychiatric staff to visit during this period. *See Pulka* 40 N.Y.2d at 784, 390 N.Y.S.2d 393, 358 N.E.2d 1019 (" 'Negligence in the air, so to speak, will not do' ") (citations omitted).

**IV. Conclusion:**

Notwithstanding counsel's able and compassionate representation of his client, the evidence simply does not establish the liabili-

ty of either defendant Crosier or defendant Lodge under either of plaintiff's legal theories. Judgment is therefore entered in favor of defendants Lodge and Crosier and plaintiff's complaint is DISMISSED in its entirety.

IT IS SO ORDERED.